AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>TATIJANA YADMEEN BELL | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>19MJ01298 |

Complaint for violation of Title 21, United States Code, Section 846

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE ALICIA G. ROSENBERG | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>March 27, 2019 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

FILED
CLERK, U.S. DISTRICT COURT
03/29/2019
CENTRAL DISTRICT OF CALIFORNIA
BY: AP         DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. § 846]

Beginning on a date unknown, and continuing to on or about March 27, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendant TATIJANA YADMEEN BELL conspired with others known and unknown to intentionally possess with the intent to distribute at least one kilogram of a mixture and substance containing a detectable amount of heroin, a Schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(i).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Samuel Lawson<br>OFFICIAL TITLE<br>Special Agent – Homeland Security Investigations |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>Alicia G. Rosenberg | DATE<br>March 29, 2019 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Jehan Pernas x0319        REC:DET

## AFFIDAVIT

I, Samuel Lawson, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Tatijana Yadmeen BELL ("BELL") for a violation of Title 21, United States Code, Section 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances).

2. This affidavit is also made in support of an application for a warrant to search two digital devices seized on March 27, 2019, namely, a white iPhone, model MN1L2LL/A, serial number FK2Y39PEHFLQ ("SUBJECT DEVICE 1"), and a black iPhone, model MNR52LL/A, serial number FCFTD5Z1HG00 ("SUBJECT DEVICE 2"), currently in the custody of Homeland Security Investigations ("HSI") in Los Angeles, California, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute, or Distribution of, a Controlled Substance) and 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute, or Distribution of, a Controlled Substance) (collectively, the "Subject Offenses"), as described further in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

1

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II. BACKGROUND OF SPECIAL AGENT SAMUEL LAWSON

5. I have been employed as a Special Agent ("SA") with HSI since 2015. Prior to working as a SA with HSI, I was an Intelligence Research Specialist and Investigative Assistant for HSI from January 2009 until April 2015. Prior to that, I served seven years with the United States Army as a Human Intelligence Collector conducting counter-terrorism investigations, during which I was awarded the Bronze Star and two Army Commendation Medals.

6. Since my employment with HSI, I have been involved in multiple drug-related investigations. I have worked and conferred with experienced agents/officers in the field of drug law enforcement, and drawn from their knowledge and experience. I have participated in numerous investigations into the unlawful importation, possession with intent to distribute, and distribution of controlled substances, as well as conspiracies associated with criminal drug offenses. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance, as well as various informants and cooperating

sources. Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by drug traffickers to smuggle and safeguard drugs, to distribute drugs, and to collect and launder related drug proceeds.

7. I am currently assigned to the HSI Los Angeles Regional Aviation Enforcement ("RAVEN") Task Force ("TF"). The HSI RAVEN TF works closely with the United States Customs and Border Protection, and the Transportation Security Administration ("TSA"). Specifically, the HSI RAVEN TF is focused in part on investigating airline passengers who smuggle drugs and drug proceeds through the airport.

### III. SUMMARY OF PROBABLE CAUSE

8. On or about March 27, 2019, SAs from the Department of Homeland Security ("DHS"), and officers from the Long Beach Police Department ("LBPD") working on a joint investigation of a drug trafficking organization ("DTO") found approximately 1,037.44 grams of heroin concealed in a false bottom in a suitcase belonging to Dejanee Nicole Cook ("Cook").

9. Earlier, law enforcement saw that BELL had transported Cook to the Hollywood-Burbank airport for her flight on March 27, 2019. During this investigation, HSI was aware that BELL had transported a number of other drug couriers to the airport from June 2018 through January 2019, all of whom were arrested because heroin was found in their luggage. In a post-Miranda

3

interview, BELL admitted that she drove couriers to the airport, but claimed that she thought they were smuggling money.

## IV. STATEMENT OF PROBABLE CAUSE

10. Based on my review of law enforcement reports, as well as my own observations and knowledge of the investigation, I am aware of the following:

### A. BELL drives Cook to Airport, and Heroin Found in Cook's Luggage

11. On or about March 27, 2019, while conducting an investigation into a DTO, I learned of a United Airlines ("UA") reservation made for passenger COOK that was consistent with other reservations of DTO members. COOK was scheduled to be a passenger for a UA flight departing from Hollywood-Burbank Airport on March 27, 2019 at 8:00 p.m. The flight was going to arrive on March 28, 2019 in Greensboro, North Carolina. Based on prior experiences with this DTO, I believed that COOK was a potential drug courier. I searched for COOK in various law enforcement databases, and identified a California Driver's License photograph for COOK.

12. At approximately 7:15 p.m. on March 27, 2019, while conducting surveillance in front of the Hollywood-Burbank Airport, I saw a dark red Chevrolet four door sedan, with California License plate "8EUA935" ("sedan"), arrive in front of the UA terminal entrance. The sedan parked curbside in front of the UA entrance. A female matching Cook's description exited the back seat of the sedan and approached the sedan's trunk. Cook then opened the sedan's trunk and removed a red duffle bag

(the "duffle bag"), and closed the trunk. Cook entered the Hollywood-Burbank Airport and proceeded directly to the UA ticketing counter. After Cook entered the airport, the sedan pulled away from the airport curbside drop-off area.

  13. LBPD detectives involved in the investigation of the DTO proceeded to follow the sedan away from the airport property. At approximately 7:27 p.m. LBPD detectives saw the sedan drive through a red light without stopping while traveling eastbound away from the airport. Detective Urbina activated his police emergency lights and siren and conducted a traffic stop of the sedan.

  14. Detective Urbina and Detective Vasquez approached the sedan, and identified BELL and a male passenger. BELL told Detective Urbina that the male passenger was Tony Dewayne Jones. Inside the sedan were SUBJECT DEVICES 1 and 2. BELL was advised of her Miranda rights, and was subsequently transported to the LBPD for further questioning.

  15. At approximately 10:38 p.m. on March 27, 2019, LBPD detectives and I interviewed BELL. BELL said, in substance and in part, the following:

    a. In the past, BELL had acted as a courier and delivered bags which BELL believed contained money. Around June 2018, BELL stopped acting as a courier, and transitioned to driving various couriers to airports. BELL said she always believed the bags contained money, not drugs.

    b. BELL said that SUBJECT DEVICE 1 was her phone, and that SUBJECT DEVICE 2 belonged to her brother. She said

5

that she had accidentally used SUBJECT DEVICE 2 to discuss trips made by couriers.

  c. She gave me the passcode for both phones, and the passcode for both phones was the same.

 16. Since BELL was in possession of both phones, both phones have the same passcode, and BELL admitted to using SUBJECT DEVICE 2 to discuss courier trips to the airport, I believe both phones actually belong to BELL.

 **B.** **Previous Contacts with BELL**

  1. <u>Robin Pittman Arrest: 2.94 kilograms of heroin</u>

 17. On or about June 19, 2018, Robin Pittman ("Pittman") was scheduled to fly on an American Airline's flight from Burbank, California to Dayton, Ohio. She was arrested by HSI SAs because she had approximately 2.94 kilograms of heroin in a hidden compartment in her checked luggage.

 18. HSI SA Gillan and I advised Pittman of her <u>Miranda</u> rights. Pittman agreed to speak with us, and we interviewed her. Pittman said, in substance and in part, the following: Pittman admitted that she had made multiple trips as a courier. Pittman said that a female named "Tasha" (later identified as BELL) gave her a duffle bag to transport, and drove Pittman to the airport on June 19, 2018. Pittman said that she expected to be paid cash in exchange for delivering the duffle bag and that she thought the bag only contained money. PITTMAN said that she had also communicated with "Tasha" by phone, and she identified "Tasha's" phone number as (909) 520-7685. I sent a subpoena to T-Mobile to determine the subscriber information for Tasha's

phone number, and learned that the subscriber was BELL. I also reviewed BELL's Department of Motor Vehicles ("DMV") photograph.

19. Pittman was indicted by a Grand Jury on or about July 10, 2018 for a violation of 21 U.S.C. §§ 841(a)(1),(b)(1)(A)(i) (Possession with Intent to Distribute Heroin).

    2. Brezanae Nicole Drew Arrest: 2.2 kilograms of heroin

20. On or about September 11, 2018 Brezanae Nicole Drew ("Drew") was scheduled to fly on an American Airlines flight from Ontario, California to Dayton, Ohio. She was arrested by the Ontario Police Department ("OPD") because she had 2.2 kilograms of heroin in a hidden compartment in her checked luggage.

21. HSI SAs Richard Tovar and Shane Van Gundy advised Drew of her Miranda rights. Drew agreed to speak with them, and they interviewed her. Drew said, in substance and in part, the following: approximately one month prior to her flight on September 11, 2018, Drew's cousin asked Drew if she wanted to make extra money, and Drew said yes. Drew's cousin said she knew some girls she could put Drew in contact with. An unknown female ("UF") then called Drew to tell her she would pay Drew $2,000 to take a bag with her on a plane. Drew said she thought the bag contained money. The UF contacted DREW from telephone number (909) 520-7685. The number (909) 520-7685 was previously identified as belonging to BELL (see Affidavit ¶ 18). Drew was also shown a six-pack photographic lineup containing BELL's DMV

photograph, and Drew identified BELL as the person who also drove her to the airport for her flight on September 11, 2018.

22. Drew was indicted by a Grand Jury on or about November 29, 2018 for a violation of 21 U.S.C. §§ 841(a)(1),(b)(1)(A)(i) (Possession with Intent to Distribute Heroin).

   3. Garionna Dezne Murphy Arrest: 1.9 kilograms of heroin

23. On or about September 30, 2018, Garionna Dezne Murphy ("Murphy") was scheduled to fly on an American Airlines flight from Burbank, California to Greensboro, North Carolina. She was arrested by HSI because in her checked luggage was 1.9 kilograms of heroin in a hidden compartment.

24. I advised Murphy of her Miranda rights. Murphy agreed to speak with me, and I then interviewed her. Murphy told me, in substance and in part, that she had communicated by phone with a woman named "Tati," and that "Tati" had driven her to the airport on September 30, 2018. When asked if she could identify "Tati" out of a six-pack photographic lineup, Murphy selected BELL's photograph. Murphy said that she believed she was only transporting money.

25. Murphy was indicted by a Grand Jury on or about October 19, 2018 for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i) (Possession with Intent to Distribute Heroin).

   4. Machakas Ella Horton Arrest: 2.5 kilograms of heroin

26. On or about January 19, 2019, Machakas Ella Horton ("Horton") was scheduled to fly on American Airlines flight to Dallas, Texas, with a connecting flight to Greensboro, North

Carolina. She was arrested by OPD because she had 2.5 kilograms of heroin in a hidden compartment in her checked luggage.

27. I advised Horton of her Miranda rights. Horton agreed to speak with me, and I then interviewed her. She said, in substance and in part, that a woman named "Tatiana" drove her to the airport for the flight on January 19, 2019. Horton said that she thought she was only transporting money.

28. I reviewed airport surveillance footage taken on January 19, 2019, and it showed BELL walking into the airport terminal with Horton, and standing with Horton while she checked in for her flight at the check-in counter.

29. A complaint was filed against Horton on March 5, 2019 for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i) (Possession with Intent to Distribute Heroin).

     5.    Keeshanai Monique Wilcher Arrest: 1.44 kilograms of heroin

30. On or about January 24, 2019, Keeshanai Monique Wilcher ("Wilcher") was scheduled to fly on an Alaskan Airlines flight to Portland, Oregon, with a connecting American Airlines flight to Greensboro, North Carolina. Wilcher was arrested by OPD because there was approximately 1.44 kilograms of heroin in a hidden compartment in her checked luggage.

31. OPD Officer Reyes advised Wilcher of her Miranda rights. Wilcher agreed to speak with him, and he then interviewed her. Wilcher said, in substance and in part, the following: Wilcher said "Jessica" - later identified as BELL - drove Wilcher to the airport and provided Wilcher with the bag

9

which contained the heroin. When asked to identify "Jessica" out of a six-pack photographic lineup, Wilcher selected BELL's photograph. Wilcher said that she thought she was only transporting money.

32. I later reviewed airport surveillance footage taken on January 24, 2019, and saw BELL walking into the airport terminal with Wilcher, and standing near her while Wilcher checked in for her flight.

33. A complaint was filed against Wilcher on March 5, 2019 for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i) (Possession with Intent to Distribute Heroin).

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

34. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained

where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

      c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

      e. Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

35. As used herein, the term "digital device" includes the SUBJECT DEVICES.

36. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

12

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

  c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

  d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

 37. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

  a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

  b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

38. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

39. Based on the foregoing, there is probable cause to believe that BELL violated Title 21, United States Code, Section 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

_____
Samuel Lawson
Special Agent
Homeland Security
Investigations

Subscribed to and sworn before me
this 29th day of March 2019.

_____
THE HONORABLE
UNITED STATES MAGISTRATE JUDGE

14